

FILED

NOV 22 2017

Clerk, U S District Court
District Of Montana
Billings

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FRANCISCO CALDERON and LUIS JAVIER GASPAR,<br><br>Defendants. | CR 17-36-BLG-SPW<br><br>OPINION AND ORDER |

Before the Court is a joint motion to suppress evidence (Doc. 38) filed by Defendants Francisco Calderon and Luis Gaspar. For the following reasons, the Court DENIES the motion.

## I. Findings of Fact

On March 13, 2017, while driving north of downtown Billings, Detective Ken Tuss's attention was caught by a California-plated red Subaru Forester that pulled into a nearby motel. Detective Tuss, an officer with eastern Montana's HIDTA (High Intensity Drug Trafficking Area) task force, knew other HIDTA officers were investigating a California-based cartel whose members frequently

1

used the motel when distributing drugs in Montana. Detective Tuss observed two men, later identified as Francisco Calderon and Luis Gaspar, exit the Forester and enter the motel. Detective Tuss queried the Subaru's license plate and discovered the Forester was registered to a Carlos Moreira-Torres in San Jose, California. The The next day, Detective Tuss relayed the information to fellow HIDTA officer Detective Jamie Schillinger. Detective Schillinger did not recognize the name Moreira-Torres but confirmed that the California-based drug cartel he was investigating operated out of San Jose and frequently used the motel when distributing in Montana. Detective Schillinger, Detective Tuss, and Border Patrol Agent Jonathan Duquette, an agent with the FBI's Transnational Organized Crime task force, decided to conduct surveillance on the motel.

In the early afternoon, Agent Duquette, sitting in an unmarked police car, observed Calderon and Gaspar exit the motel and walk towards the Forester. Shortly after, a flatbed pickup truck drove into the parking lot and parked a few spaces away from the Forester. Agent Duquette drove around the block to conduct a drive-by surveillance. When the parking lot came back into Agent Duquette's view, he observed Calderon, Gaspar, and a white male speaking near the Forester and flatbed pickup. Agent Duquette continued around the block.

A minute or two later, Detective Tuss, in another unmarked police car, conducted a drive-by surveillance of the parking lot. When Detective Tuss drove past the parking lot he saw three men, whom he could not identify but presumed to be Calderon, Gaspar, and the white male, sitting in the Forester. Detective Tuss continued around the block.

A minute later, Agent Duquette finished circling the block and drove past the parking lot again. Agent Duquette could not see anyone in the parking lot this time. As Agent Duquette continued around the block he saw the flatbed pickup idling in the parking lot's alley exit with the white male in the driver's seat. Calderon and Gaspar were walking away from the flatbed pickup. From his vantage point, Agent Duquette could not see where Calderon and Gaspar went. The flatbed pickup pulled out of the alley and drove away, but not before Agent Duquette was able to relay the flatbed pickup's license plate to dispatch. Dispatch stated the flatbed pickup was registered to a Leslie and Kimberly Birdinground in Crow Agency, Montana, located within the Crow Indian reservation.

Agent Duquette relayed dispatch's information to Detective Schillinger. Detective Schillinger did not recognize the names so he relayed them to Bureau of Indian Affairs Special Agent Kevin Proctor. Agent Proctor was involved in the reservation aspect of the investigation into the San Jose-based cartel. Agent

3

Proctor told Detective Schillinger the Birdingrounds were known drug users and were under investigation for distribution on the reservation. At that point, Detective Tuss, Detective Schillinger, and Agent Duquette planned their course of action: if the Forester left the parking lot and committed a traffic violation, they would pull it over and have a K-9 unit from the Billings city police perform a dog sniff on the vehicle. They contacted Billings Police K-9 Officer Jim Nyquist and requested he be on standby.

Shortly thereafter, Calderon and Gaspar got into the Forester, drove out of the parking lot, and headed south towards the highway. Detective Schillinger followed the Forester and observed it change lanes without a turn signal while simultaneously cutting off a semi-truck. Detective Schillinger decided not to pull the Forester over because Officer Nyquist was not in the vicinity yet. The Forester Forester continued south and entered the interstate headed eastbound. Agent Duquette contacted Montana Highway Patrol trooper Jack Rhodes and told him there was a California-plated red Subaru Forester headed eastbound on the interstate that was suspected of drug activity. Agent Duquette did not direct Trooper Rhodes to pull the Forester over. Instead, Agent Duquette told Trooper Rhodes that he would assist with a traffic stop if Trooper Rhodes had reason to pull the Forester over.

Trooper Rhodes quickly parked in the interstate's median a few miles east of where the Forester entered the interstate. A few minutes later, the Forester, following closely behind a semi-truck, drove past Trooper Rhodes. Trooper Rhodes pulled onto the interstate and followed about 150 yards behind the Forester. After about a half-mile, Trooper Rhodes saw the Forester suddenly brake to avoid rear ending the semi-truck. Trooper Rhodes initiated his overhead lights. The Forester pulled on to the interstate's shoulder and stopped.

Trooper Rhodes approached the Forester on the passenger side. Calderon was in the driver's seat and Gaspar was in the front passenger seat. Trooper Rhodes explained that he pulled them over for following the semi-truck too closely and nearly rear ending it. Trooper Rhodes asked Calderon for his driver's license, registration, and insurance. Calderon replied in Spanish and Gaspar explained that that Calderon did not speak English. Calderon handed Trooper Rhodes a Mexican identification card. Gaspar explained that Calderon didn't have a license because it it was expired. Trooper Rhodes returned to his patrol car and ran Calderon's name name through his computer to check if Calderon had a valid driver's license or active warrants. The computer showed Calderon had an arrest warrant out of California. Trooper Rhodes asked his dispatch to confirm Calderon's arrest warrant was still valid.

While Trooper Rhodes waited for dispatch to confirm Calderon's arrest warrant, K-9 Officer Nyquist arrived on scene. Trooper Rhodes asked Officer Nyquist to obtain Gaspar's information. Gaspar told Officer Nyquist he didn't have an ID card and gave his name and date of birth instead. Nyquist relayed Gaspar's information to Trooper Rhodes, who ran it through the computer. The computer showed Gaspar also had an arrest warrant out of California. Trooper Rhodes asked dispatch to confirm Gaspar's arrest warrant was still valid.

While waiting for dispatch to confirm the warrants for Calderon and Gaspar, Trooper Rhodes directed Calderon and Gaspar to exit the vehicle, handcuffed them, and placed them in separate police cars. Dispatch confirmed the arrest warrants were valid. K9 Officer Nyquist had his dog sniff the Forester and the dog alerted to both the front passenger door and the driver's door. Calderon and Gaspar were transported to the Yellowstone County jail. The Forester was impounded and Detective Schillinger applied for, and was granted, a warrant to search the vehicle. A search of the vehicle uncovered, among other things, three cell phones, $8,400 in cash, and a .38 caliber revolver.

## II. Standard of review

On a motion to suppress, the Ninth Circuit reviews legal conclusions de novo and factual findings for clear error. *United States v. Basher*, 629 F.3d 1161,

1167 (9th Cir. 2011).

**III. Law**

The Fourth Amendment permits brief investigative stops when a law enforcement officer has reasonable suspicion that a particular person is committing a crime or violating the traffic code. *Heien v. North Carolina*, 135 S.Ct. 530, 536 (2014); *see also United States v. Lopez-Soto*, 205 F.3d 1101, 1004 (9th Cir. 2000) (reasonable suspicion standard applies regardless of whether person is suspected of violating criminal code or traffic code). Reasonable suspicion requires "a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Heien*, 135 S.Ct. at 536 (citing *Navarette v. California*, 134 S.Ct. S.Ct. 1683, 1687 (2014)). The reasonable suspicion necessary to justify an investigative stop is dependent upon both the content of information possessed by police and its degree of reliability. *Navarette*, 134 S.Ct. at 1687 (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). The officer's reasonable suspicion must be particular *to the person stopped*. Prefabricated or recycled profiles of suspicious behavior "very likely to sweep many ordinary citizens into a generality of suspicious appearance" will not suffice. *United States v. Rodriguez*, 976 F.2d 592, 595-596 (9th Cir. 1992). In determining reasonable suspicion, the Court must consider all of of the information under the totality of the circumstances. *Navarette*, 134 S.Ct. at

1687.

An officer's subjective intent in stopping a person is irrelevant so long as there is an objective basis justifying the stop. *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). However, an officer's subjective intent may be relevant in determining the officer's credibility. *See United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015). A district court's credibility determinations are given "special deference." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008).

If a person is stopped for violating the traffic code, the stop may not be prolonged beyond the time reasonably required to complete the mission of the stop. *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate that purpose." *Rodriguez*, 135 S.Ct. at 1614. Authority for the stop ends when tasks tied to the traffic infraction infraction are, or reasonably should have been, completed. *Rodriguez*, 135 S.Ct. at 1614. Such tasks typically include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Rodriguez*, 135 S.Ct. at 1615. A

valid arrest warrant authorizes an officer to arrest a person and take him into custody. U.S. Const. amend. IV; *see generally Payton v. New York*, 445 U.S. 573 (1980).

In the context of a traffic stop, a dog sniff is not considered a search. *Caballes*, 543 U.S. at 405. It may be conducted even when a stop is not drug-related so long as it does not unreasonably prolong the stop. *Caballes*, 543 U.S. at 408-409; *Rodriguez*, 135 S.Ct. at 1615. If the dog sniff does unreasonably prolong the stop beyond the stop's initial purpose, the officer must articulate independent reasonable suspicion justifying the prolonged stop. *Rodriguez*, 135 S.Ct. at 1616-1617. But in either case, the issue is whether the seizure was justified, not whether a search occurred. *See Caballes*, 543 U.S. at 409 ("[T]he use of a well-trained narcotics-detection dog—'one that does not expose noncontraband items that otherwise would remain hidden from public view,' [*United States v. Place*, 462 U.S. 696, 707 (1983)]—during a lawful traffic stop, generally does not implicate legitimate privacy interests.").

## IV. Analysis

Calderon and Gaspar argue the evidence should be suppressed because the stop was pretextual, unsupported by reasonable suspicion, and unreasonably prolonged. The government responds that it had reasonable suspicion that Calderon and Gaspar were distributing drugs and had violated the traffic code. The

government further responds the stop was not unreasonably prolonged because it was effectively over when Calderon and Gaspar were arrested. The Court agrees with the government, in part.

There is little dispute the stop was a pretext. All of the investigating officers stated their intention to pull the Forester over if it violated the traffic code was a pretext to further their drug investigation. The defendants argue the pretext invalidates the stop, citing *United States v. Cannon*, 29 F.3d 472 (9th Cir. 1994). However, as counsel for the defendants are or should be well aware, the Ninth Circuit has repeatedly recognized *Cannon*'s pretext analysis was effectively overruled by the Supreme Court in *Whren*. *See United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000) ("The fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop.") (citing *Whren* 517 U.S. at 810). Under *Whren*, the court's inquiry is whether there is an objective basis justifying the stop. *Fowlkes*, 804 F.3d at 971.

Here, the stop was not justified based on suspicion that Calderon and Gaspar were distributing drugs. The drug-related information the agents possessed against Calderon and Gaspar was, at the time, slim at best. Two unidentified males, driving a California-plated Subaru Forester registered in San Jose, were staying at a motel which agents knew a San Jose cartel often used. At some point, the two unidentified

males spoke with an alleged drug user in the motel's parking lot and in the Forester. That's it. Essentially, according to the government, any men from San Jose, the tenth largest city in the country, who stayed at the motel and spoke with an alleged drug user would be subject to a *Terry* stop. That broad of a stroke cannot rise to reasonable suspicion because it is "very likely to sweep many ordinary citizens into a generality of suspicious appearance." *Rodriguez*, 976 F.2d at 595-596.

However, the stop was justified based on Trooper Rhodes' observation of the Forester following the semi-truck too closely. The Court has considered the pretext evidence in determining Trooper Rhodes' credibility and found him to be credible. *Evans*, 786 F.3d at 788. Trooper Rhodes observed the Forester suddenly brake to avoid rear-ending the semi-truck, which is a violation of Montana Code Annotated § 61-8-329(1). Trooper Rhodes' observation provided reasonable suspicion to stop the Forester for a violation of the traffic code. *Lopez-Soto*, 205 F.3d at 1004.

Trooper Rhodes did not unreasonably prolong the stop to conduct a dog sniff of the Forester because the arrest warrants authorized Trooper Rhodes to prolong the stop. Shortly after stopping the Forester, Trooper Rhodes asked for Calderon's license and registration and ran a warrant check on both men, all of which Trooper Rhodes was authorized to do incident to the traffic stop. *Rodriguez*, 135 S.Ct. at 1615. The warrant checks showed Calderon and Gaspar had arrest warrants out of

California, which granted Trooper Rhodes' independent justification to prolong the stop. *Rodriguez*, 135 S.Ct. at 1616-1617. Although it's unclear whether the dog sniff occurred shortly before or after the warrants were confirmed, it makes no difference in the analysis. If the dog sniff occurred before the warrants were confirmed, Trooper Rhodes was authorized to prolong the stop while waiting for confirmation because he had independent reasonable suspicion the men had warrants out. If the dog sniff occurred after the warrants were confirmed, Trooper Rhodes was authorized to arrest the men and take them into custody. U.S. Const. amend. IV; *see generally Payton*, 445 U.S. 573. In either case, the continued seizure of Calderon and Gaspar was justified. *Rodriguez*, 135 S.Ct. at 1616-1617.

The dog sniff of the Forester did not require reasonable suspicion to search. *Caballes*, 543 U.S. at 409. So long as the seizure of Calderon and Gaspar was justified, Officer Nyquist was free to have his dog sniff the Forester. *Caballes*, 543 U.S. at 408-409; *Rodriguez*, 135 S.Ct. at 1615. After the dog alerted twice, the Forester was sealed and impounded. Detective Schillinger applied for, and was granted, a warrant to search the vehicle. The stop and search of Calderon and Gaspar was constitutional from inception through conclusion.

## V. Conclusion

For the reasons stated, the defendants' joint motion to suppress is DENIED.

DATED the 22 day of November, 2017.

/s/ Susan P. Watters
SUSAN P. WATTERS
UNITED STATES DISTRICT JUDGE